1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SHONITA PETERS,[1]              ) Case No. CV 13-8907-JPR
                               )
              Plaintiff,       )
                               )
         vs.                   ) **MEMORANDUM OPINION AND ORDER**
                               ) **AFFIRMING COMMISSIONER**
CAROLYN W. COLVIN,             )
Acting Commissioner of         )
Social Security,               )
                               )
              Defendant.       )
_____)

**I.    PROCEEDINGS**

      Plaintiff seeks review of the Commissioner's final decision
denying her application for Social Security Income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  This
matter is before the Court on the parties' Joint Stipulation,
filed August 7, 2014, which the Court has taken under submission
without oral argument.  For the reasons stated below, the
Commissioner's decision is affirmed and judgment is entered in

_____

      [1]    Plaintiff's first name appears to be misspelled in the
caption.  (See AR 106, 117 (Plaintiff signing name as Shontia
Peters).)

her favor.

**II.  BACKGROUND**

Plaintiff was born on February 2, 1972.  (Administrative Record ("AR") 32, 107.)  She completed 11th grade.  (AR 32, 124.) She had no past relevant work.  (See AR 34-36, 242.)

On June 30, 2010, Plaintiff filed an application for SSI. (AR 107-10; see AR 113.)  She alleged that she had been unable to work since October 5, 2005, because of seizures.  (AR 107, 124.) After Plaintiff's application was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge.  (AR 74-76.)

A hearing was held on May 22, 2012, at which Plaintiff appeared and was represented by counsel.  (See AR 27.)  Plaintiff testified, as did a vocational expert.  (See AR 27-59.)  In a written decision issued July 27, 2012, the ALJ determined that Plaintiff was not disabled.  (AR 11-17.)  On October 16, 2013, the Appeals Council denied Plaintiff's request for review.  (AR 1-3.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035.  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.  The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of

3

impairments significantly limiting her ability to do basic work
activities; if not, a finding of not disabled is made and the
claim must be denied.  § 416.920(a)(4)(ii).

    If the claimant has a "severe" impairment or combination of
impairments, the third step requires the Commissioner to
determine whether the impairment or combination of impairments
meets or equals an impairment in the Listing of Impairments
("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix
1; if so, disability is conclusively presumed and benefits are
awarded.  § 416.920(a)(4)(iii).

    If the claimant's impairment or combination of impairments
does not meet or equal an impairment in the Listing, the fourth
step requires the Commissioner to determine whether the claimant
has sufficient residual functional capacity ("RFC")[2] to perform
her past work; if so, the claimant is not disabled and the claim
must be denied.  § 416.920(a)(4)(iv).  The claimant has the
burden of proving she is unable to perform past relevant work.
Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a
prima facie case of disability is established.  Id.

    If that happens or if the claimant has no past relevant
work, the Commissioner then bears the burden of establishing that
the claimant is not disabled because she can perform other
substantial gainful work available in the national economy.
§ 416.920(a)(4)(v).  That determination comprises the fifth and
final step in the sequential analysis.  § 416.920; Lester, 81

---

    [2]    RFC is what a claimant can do despite existing exertional
and nonexertional limitations.  § 416.945; see Cooper v. Sullivan,
880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since June 30, 2010, her application date. (AR 13.) At step two, he found that Plaintiff had the severe impairment of "seizure disorder." (<u>Id.</u>) At step three, the ALJ determined that Plaintiff's impairment did not meet or equal any of the impairments in the Listing. (AR 13-14.) At step four, the ALJ found that Plaintiff had the RFC to perform medium work but with additional limitations. (<u>Id.</u>) Specifically, Plaintiff "can perform work that does not require climbing ladders, ropes or scaffolds, or balancing; does not require any exposure to hazardous machinery, unprotected heights, or other high risk, hazardous or unsafe conditions, and does not require the driving of a motor vehicle (i.e., seizure precautions)." (AR 14.) The ALJ further found that Plaintiff was restricted to work that "would not pose a danger to onself or others." (<u>Id.</u>) The ALJ found that Plaintiff had no past relevant work. (AR 16.) At step five, based on the VE's testimony, the ALJ concluded that Plaintiff could perform jobs that existed in significant numbers in the national economy. (AR 16-17.) Accordingly, he found Plaintiff not disabled. (AR 17.)

**V.   DISCUSSION**

<u>The ALJ Gave Clear and Convincing Reasons for Discounting</u>

<u>Plaintiff's Credibility</u>

Plaintiff contends only that the ALJ failed to give clear and convincing reasons for rejecting her testimony. (J. Stip. at 3-5.) The ALJ did not err.

5

1            1.   <u>Applicable law</u>

2        An ALJ's assessment of symptom severity and claimant

3   credibility is entitled to "great weight."  See Weetman v.

4   Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

5   F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

6   believe every allegation of disabling pain, or else disability

7   benefits would be available for the asking, a result plainly

8   contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674

9   F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks

10  omitted).

11       In evaluating a claimant's subjective symptom testimony, the

12  ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d

13  at 1035-36.  "First, the ALJ must determine whether the claimant

14  has presented objective medical evidence of an underlying

15  impairment [that] could reasonably be expected to produce the

16  pain or other symptoms alleged."  Id. at 1036 (internal quotation

17  marks omitted).  If such objective medical evidence exists, the

18  ALJ may not reject a claimant's testimony "simply because there

19  is no showing that the impairment can reasonably produce the

20  degree of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1282

21  (9th Cir. 1996) (emphasis in original).

22       Second, if the claimant meets the first test, the ALJ may

23  discredit the claimant's subjective symptom testimony only if he

24  makes specific findings that support the conclusion.  See Berry

25  v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding

26  or affirmative evidence of malingering, the ALJ must provide

27  "clear and convincing" reasons for rejecting the claimant's

28  testimony.  Lester, 81 F.3d at 834; Ghanim v. Colvin, 763 F.3d

                                6

1   1154, 1163 & n.9 (9th Cir. 2014).

2        In assessing a claimant's credibility, the ALJ may consider

3   (1) ordinary techniques of credibility evaluation, such as the

4   claimant's reputation for lying, prior inconsistent statements,

5   and other testimony by the claimant that appears less than

6   candid; (2) unexplained or inadequately explained failure to seek

7   treatment or to follow a prescribed course of treatment; (3) the

8   claimant's daily activities; (4) the claimant's work record; and

9   (5) testimony from physicians and third parties.   <u>Thomas v.</u>

10  <u>Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002); <u>Smolen</u>, 80 F.3d

11  at 1284.   If the ALJ's credibility finding is supported by

12  substantial evidence in the record, the reviewing court "may not

13  engage in second-guessing."   <u>Thomas</u>, 278 F.3d at 959.

14            2.   <u>Relevant background</u>

15       On December 9, 2010, Plaintiff completed a Seizure

16  Questionnaire with her sister's help.   (AR 116-19.)   Plaintiff

17  stated that she began having seizures in 2006 and continued to

18  have them "every other day."   (AR 116.)   She said her most recent

19  seizures had occurred on November 10, 11, and 22 and December 1

20  and 8, 2010.   (<u>Id.</u>)   When Plaintiff had a seizure, she lost

21  consciousness, had convulsions, bit her tongue "really bad," and

22  lost bladder control.   (<u>Id.</u>)   She estimated that her seizures

23  lasted between five and 10 minutes and said that afterward she

24  felt weak, tired, and "really out of it."   (<u>Id.</u>)   Following a

25  seizure she would sleep for a "longtime [sic]" and would "feel

26  normal again" upon waking.   (<u>Id.</u>)

27

28

7

1    Plaintiff said she had been taking Dilantin[3] since 2006 and
2    always took her medication but, somewhat contradictorily,
3    occasionally ran out because of "lack of funds." (AR 118.)  She
4    said that the medicine controlled her seizures "every now, then"
5    but that she still "ha[d] them frequently." (Id.)  She said she
6    was seen by a medical provider twice a month for her seizures.
7    (Id.)

8    On January 29, 2011, Plaintiff completed a second Seizure
9    Questionnaire.  (AR 120-22.)  She stated that she began having
10   seizures in 2005 and continued to have them "every other day."
11   (AR 120.)  She said her most recent seizures had occurred on
12   January 22, 23, 25, and 27, 2011.  (Id.)  When Plaintiff had a
13   seizure, she lost consciousness, had convulsions, bit her tongue,
14   and lost bladder control.  (Id.)  She estimated that her seizures
15   lasted between three and five minutes and said that afterward she
16   felt "drained" and "we[a]k," with "alot [sic] of body pain."
17   (Id.)  After a seizure, she would feel normal again within "two
18   to three hours, after sleeping." (Id.)

19   Plaintiff again said she always took her medication but
20   occasionally ran out, although this time she did not attribute it
21   to lack of funds.  (AR 121.)  She said that the medicine
22   controlled her seizures "not at all sometimes." (Id.)  She was
23   seen twice a month by a medical provider.  (Id.)

24   At the May 22, 2012 hearing, Plaintiff testified that she

25

26       [3]  Dilantin   is   a   brand   name   for   phenytoin,   an
27   anticonvulsant.        See    Phenytoin,    MedlinePlus,
     http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.html (last
28   updated May 1, 2009).  Phenytoin controls certain types of seizures
     by decreasing abnormal electrical activity in the brain.  Id.

did not have a driver's license, had been given a ride to the hearing, and generally took the bus for "every day transportation." (AR 32-33.) She initially said she had not worked in the previous 15 years but then said she had performed in-home child care up until 2005. (AR 33, 35.) She testified that in 2005, she was hired for a similar position but the offer was withdrawn when the employer learned that she had epilepsy. (AR 34.)

Plaintiff testified that she continued to take Dilantin and had also begun taking Keppra "four or five months" earlier, at the beginning of 2012.[4] (AR 37-38, 43.) She brought her medication to the hearing to show the ALJ because "I'm slow and confused sometimes." (AR 37.) She said the Keppra "helps me better" than the Dilantin alone. (AR 38.) When asked by the ALJ about the many indications in Plaintiff's medical records that she had not been taking her medicine, she said, "I've been taking them but they haven't given me – was not enough." (Id.) Plaintiff clarified:

> I takes [sic] my medication every day but by me taking
> them they said it still wouldn't – I still would go into
> the seizures, as well. So they told me I've been taking
> my medication but not enough medication. So that's when
> they put me on the Keppra.

(AR 39.) Plaintiff testified that the seizures had not

---

[4]   Keppra is the brand name for levetiracetam, an anticonvulsant that treats seizures by "decreasing abnormal excitement in the brain." See Levetiracetam, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699059.html (last updated Sept. 1, 2009).

diminished since she began taking Keppra.  (<u>Id.</u>)  She said, "I have them every day."  (<u>Id.</u>)

When asked about her medical providers, Plaintiff testified that she continued to see Dr. Munther Hijazin, was not sure where his offices were, and thought he was a neurologist.  (<u>Id.</u>) Plaintiff said that she was "very confused" and "would have to think a lot to remember."  (<u>Id.</u>)  She said that she also received emergency treatment at Centinela Hospital.  (AR 40-41.)

Plaintiff testified that she was "[s]cared to do too much during the day."  (AR 41.)  She said she "tr[ied] to sit and be comfortable and relax myself" and "not to do too much" "[b]ecause I was told not to do too much."  (AR 41-42.)

> I walk around.  I basically just keep to myself, you
> know, make sure everything okay [sic].  If I could work
> I could but I can't so I just keep to myself around the
> day, you know, and pray that I don't pass out.

(AR 42.)  Plaintiff said she did not cook but did laundry and "[e]very once in awhile" would clean house or shop for food. (<u>Id.</u>)  She said she "sometimes" would exercise by "try[ing] to walk around but not too much."  (<u>Id.</u>)

Plaintiff testified that she had last visited the emergency room two weeks before.  (AR 44.)  She said she last had a seizure the morning of the hearing.  (<u>Id.</u>)  Plaintiff said that she lost consciousness and bladder control when she had seizures.  (AR 45- 46.)  She said she convulsed, "spit," "slob[bered]," and "tore up my tongue[]."  (AR 46.)  She said that after having a seizure, she would sweat, be confused for a while, and sleep for a "long time."  (<u>Id.</u>)  She said if she slept for too long, witnesses to

her seizure would become nervous that another seizure was imminent and would call for an ambulance.  (<u>Id.</u>)

When asked whether she had experienced an aura before a seizure, Plaintiff testified:

> I see lights.  I'll be stiff where I won't – or I go into
> a stare.  I see rainbow colors, everything and then I
> [witness snaps fingers] go.

(AR 47.)  Plaintiff said she had been experiencing preseizure auras since 2005.  (<u>Id.</u>)  She said that her seizure disorder had worsened since she filed her application for SSI, in June 2010. (AR 48.)  She said she was "[h]aving many now" and that "if I'm going to [have] one, I'll go into a four," one after the other, "before I come back to myself."  (<u>Id.</u>)  She said that the longest seizure she had experienced had lasted three or four hours. (<u>Id.</u>)

Plaintiff estimated that if she were employed, she would miss two or three days a month because of her seizure disorder. (AR 49.)

### 3.  <u>Analysis</u>

The ALJ "acknowledge[d] that the claimant has a history of seizure disorder . . . which can reasonably result in certain functional limitations."  (AR 14 (citing AR 158-240).)  He found, however, that "the balance of the record suggests that the claimant has had a history of medication noncompliance as evidenced by consistently sub-therapeutic levels of anti-convulsant medications on laboratory testing."  (AR 14-15.) Accordingly, the ALJ found that Plaintiff's "allegations of disability stemming from her alleged 'frequent' seizures are not

11

entirely credible given her documented history of not abiding by her treatment regimen."   (AR 15.)[5]

In order to receive SSI benefits, a claimant must follow treatment prescribed by her physician if the treatment can restore her ability to work.   § 416.930(a).   Failure to do so, absent "good reason," will lead to a finding of nondisability even if the claimant's impairment meets the disability criteria. § 416.930(b); see Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995).   Further, if a claimant's impairment can be controlled with medication, she will be found not disabled.   Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").   In the case of seizures in particular, SSR 87-6 mandates that when they are alleged to occur at a disabling frequency, a record of anticonvulsant blood levels is required before a claim can be granted.   SSR 87–6, 1987 WL 109184, at *2 (1987) (recognizing that situations when seizures are not under good control are usually attributable to noncompliance with prescribed treatment).

An ALJ may rely upon a claimant's noncompliance with treatment as a clear and convincing reason for an adverse credibility finding.   See Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (ALJ

---

[5]   Plaintiff objects that the ALJ did not specify which of her statements he found not credible.   (J. Stip. at 3.)   But these findings make clear that he rejected her claims of always taking her medicine and of the disabling effects of the seizures.

may rely on "unexplained, or inadequately explained, failure to seek treatment" in rejecting claimant's credibility).   Courts have consistently found that evidence of noncompliance with prescribed medications undermines allegations of a disabling seizure disorder.   <u>See</u> <u>Bishop v. Colvin</u>, No. ED CV 13-00210 RZ, 2013 WL 6094241, at *2 (C.D. Cal. Nov. 19, 2013); <u>Whaley v.</u> <u>Astrue</u>, No. CV 10-7210-OP, 2011 WL 5434424, at *5 (C.D. Cal. Nov. 9, 2011); <u>Pa Dee Thao v. Astrue</u>, No. 1:10-CV-0244-SKO, 2011 WL 2516151, at *8-9 (E.D. Cal. June 21, 2011); <u>Juarez v. Astrue</u>, No. EDCV 10-1219 RNB, 2011 WL 2135087, at *1 (C.D. Cal. May 27, 2011); <u>Prather v. Astrue</u>, No. 2:08-cv-01476 KJN, 2010 WL 2102824, at *9 & n.11 (E.D. Cal. May 24, 2010); <u>Johnson v. Astrue</u>, No. CV 07-507 JC, 2009 WL 2579525, at *13 (C.D. Cal. Aug. 19, 2009); <u>Pham v. Shalala</u>, No. C-94-20745-JW, 1996 WL 411603, at *3 (N.D. Cal. July 16, 1996); <u>see also</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 513 (9th Cir. 2001) (affirming finding that claimant's seizure disorder did not meet listing when seizures were "largely a result of noncompliance with his prescribed therapy").

The ALJ noted that Plaintiff had been prescribed 100 milligrams of Dilantin three times daily and, more recently, 1000 milligrams of Keppra once daily.   (AR 15; <u>see</u> AR 37-38, 43, 157, 308, 311, 315, 325.)   Contrary to Plaintiff's testimony and a treating physician's statement that Plaintiff complied with her prescribed regimen, the ALJ found "overwhelming documentation of sub-therapeutic drug levels and medication noncompliance."[6]   (AR

---

[6]   On February 16, 2011, treating doctor Rosabel Young completed a form indicating that Plaintiff complied with prescribed medication, maintained therapeutic blood levels of anticonvulsant,

15.)  Further, the ALJ found that each of Plaintiff's medically documented seizures was attributable to her noncompliance.[7] (Id.)

The anticonvulsant phenytoin must be present at a concentration of between 10 and 20 micrograms per milliliter of blood (mcg/mL) in order to be effective.  (See AR 15, 180, 201, 245); Therapeutic Drug Levels, MedlinePlus, http:// www.nlm.nih.gov/medlineplus/ency/article/003430.htm (last updated Apr. 29, 2013) (noting that drug-level testing is important for people taking phenytoin to control seizures).  As the ALJ noted, on October 18, 2005, Plaintiff reported a grand mal seizure,[8]

---

and suffered seizures nonetheless.  (AR 247; see also AR 250 (on same day, Dr. Young noting that Plaintiff had returned after "3 year hiatus" for epilepsy treatment and was applying for disability).)  The ALJ dismissed Dr. Young's statements because he found them to reflect Plaintiff's own allegations rather than objective findings and because they were contradicted by "overwhelming" evidence of Plaintiff's noncompliance.  (AR 15); see Fair, 885 F.2d at 605 (finding that ALJ properly disregarded physician's opinion premised on claimant's noncredible subjective complaints); Thomas, 278 F.3d at 957 (same); Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (holding that ALJ may discredit treating physician's opinion if "unsupported by the record as a whole . . . or by objective medical findings").  Plaintiff does not challenge the ALJ's rejection of Dr. Young's statement.

[7]  Plaintiff's August 16, 2005 report of seizures, the earliest in the record, appears to have predated her diagnosis and treatment with Dilantin.  (See AR 164, 170-71 (diagnosing seizure disorder, noting no medications, prescribing Dilantin and next-day followup with regular physician).)  In November 11, 2010, Plaintiff visited the emergency room and reported a seizure but left before being triaged, so her phenytoin level was not tested; treatment notes appear to indicate that she was "uncooperative on Dilantin." (AR 183-85.)

[8]  A person suffering a grand mal, or tonic-clonic, seizure loses consciousness, her muscles stiffen, and she experiences

14

after which her phenytoin level was found to be less than 0.6 mcg/mL. (See AR 173, 180.) On November 11, 2009, Plaintiff was diagnosed with "recurrent generalized seizures," which were attributed to her noncompliance with anticonvulsant medication. (AR 15; see AR 186-88 (drug-level testing showing less than 0.05 mcg/mL of phenytoin in blood).) In August 2010, she was again treated for reported seizures, and although she claimed to be compliant, she was found to have phenytoin levels below 0.5 mcg/mL. (AR 190, 197.)

During a December 18, 2010 neurological consultation, Plaintiff reported that she was experiencing daily seizures despite her Dilantin prescription, but drug-level testing ordered by the examining physician showed only 1.0 mcg/mL of the drug in her blood. (AR 15; see AR 241-42, 245 (noting "abnormal" phenytoin level of 1.0 mcg/mL).) On February 3, 2011, Plaintiff "admit[ted] taking medication irregularly." (AR 15; see AR 271.) A few weeks later, on February 22, Plaintiff was admitted to the emergency room with complaints of seizure activity, reported that she had not taken her medication that morning, and had a phenytoin level of only 1.7 mcg/mL. (AR 15; see AR 444, 454.)

On November 4, 2011, Plaintiff admitted that "she has not had her medications in a couple of months," and drug-level testing showed only 2.0 mcg/mL of phenytoin in her blood. (AR

violent muscle contractions. See Grand Mal Seizure, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/basics/definition/con-20021356 (last updated June 10, 2014); Tonic-Clonic Seizures, Epilepsy Foundation, http://www.epilepsy.com/learn/types-seizures/tonic-clonic-seizures (last updated Mar. 2014).

15; see AR 276, 280.)  About two weeks later, on November 17,
Plaintiff reported seizures at the emergency room and was found
to have a subtherapeutic level of phenytoin in her blood.  (AR
431 (drug-level testing showing phenytoin level of 4.3 mcg/mL).)
On December 24, 2011, Plaintiff admitted to noncompliance with
her medication, which was confirmed by drug-level testing.  (AR
15; see AR 369 (doctor noting, "[s]eizure disorder secondary to
noncompliant with medication," Plaintiff "had multiple admissions
in the ER for seizure," and advising Plaintiff to "take the
medication regularly" and "see her doctor to monitor the level
closely"), 375-76 (doctor noting Plaintiff's admission of
noncompliance and subtherapeutic Dilantin level), 390 (drug-level
testing showing phenytoin level of 4.4 mcg/mL), 391.)

On February 2, 2012, Plaintiff reported seizures, presented
to the emergency room and suffered another; she said she had
taken only Keppra, not Dilantin, that morning, and drug-level
testing showed her phenytoin level to be only 0.9 mcg/mL.[9]  (AR
15; see AR 325-26, 339.)  On March 9, 2012, Plaintiff was again
seen at the emergency room with complaints of seizures, and her
phenytoin level was found to be only 0.7 mcg/mL.  (AR 15; see AR
285.)

Indeed, every drug-level test in the record, spanning a
period of seven years, showed that phenytoin was present in

---

[9]    Levetiracetam must be present at a concentration of
between 12 and 46 mcg/mL to be effective.  See Test ID: LEVE, Mayo
Clinic,    http://www.mayomedicallaboratories.com/test-catalog/
Clinical+and+Interpretive/83140 (last visited Jan. 16, 2015).  Even
once Keppra was added to Plaintiff's treatment regimen, her blood
was tested only for phenytoin.

16

levels far below those required for therapeutic effect. (See AR 234 (Apr. 29, 2008 drug-level testing showing only 1.0 mcg/mL of Dilantin in blood), 223 (Jan. 13, 2009 drug-level testing showing less than 0.8 mcg/mL of Dilantin in blood), 221 (July 21, 2009 drug-level testing showing only 2.1 mcg/mL of Dilantin in blood), 201 (Dec. 21, 2009 drug-level testing showing less than 0.5 mcg/mL of phenytoin in blood); see also AR 214 (on Apr. 4, 2008, Plaintiff reporting that she took Dilantin only once daily – not three times, as prescribed – because it made her feel "high" and that she had not had neurological consultation in over a year), 271 (on Feb. 3, 2011, examining neurologist noting, "patient admits taking medication irregularly").)

Moreover, that doctors continued to prescribe phenytoin with little variation (see AR 369 (altering dosage from 300 milligrams each night to 200 milligrams twice a day)), consistently treated Plaintiff with phenytoin in the emergency room (see AR 164, 284-86, 312, 369, 445), and attributed her continued seizures to her failure to take her medications (see AR 244, 271, 369) is evidence that compliance with treatment recommendations would have restored her ability to work, making her seizure disorder not disabling.  See § 416.930(a); Warre, 439 F.3d at 1006. Indeed, if the phenytoin had proved ineffective when taken as prescribed, they may well have prescribed other or additional treatment.  That Plaintiff consistently failed to adhere to the treatment prescribed to manage her seizure disorder both precluded the ALJ from finding her disabled and provided a clear and convincing reason for discounting the credibility of her allegations.  § 416.930; Orn, 495 F.3d at 638; Fair, 885 F.2d at

17

603.  The ALJ's rejection of Plaintiff's claims that she was compliant but Dilantin did not work (AR 15; <u>see</u> AR 118, 206; J. Stip. at 4) was thus supported by substantial evidence.  <u>Cf.</u> <u>Bishop</u>, 2013 WL 6094241, at *2 ("Plaintiff not only had been noncompliant in his medical regimen, but he also falsely stated that he had been compliant.").

Plaintiff points to her statement in her December 2010 Seizure Questionnaire that she occasionally ran out of medication because of "lack of funds" to pay for it.  (J. Stip. at 4; <u>see</u> AR 118.)  Although the Commissioner cannot "deny benefits to someone because [s]he is too poor to obtain medical treatment that may help [her]," <u>Gamble</u>, 68 F.3d at 322, Plaintiff's claim that her longstanding noncompliance was attributable to financial difficulties is unsupported by the record.  Plaintiff did not attribute her alleged lack of medication to financial difficulties in her January 2011 Seizure Questionnaire (AR 122) and made no mention of financial difficulties when questioned by the ALJ about her documented history of noncompliance (<u>see</u> AR 38-39).  Nor do Plaintiff's treatment records show that she ever told her medical providers that she was struggling to pay for her medications.  The only explanations she gave for her noncompliance were that she did not like the side effects of the medication.  (<u>See</u> AR 214 (Plaintiff reporting that Dilantin made her feel "high"), 444 (Plaintiff stating that she wanted to eat before consuming morning dose of Dilantin)); <u>cf. Pa Dee Thao</u>, 2011 WL 2516151, at *8 (rejecting contention that claimant lacked funds to remain compliant when unsupported by record).  Thus, even if at one point Plaintiff was noncompliant because she

couldn't afford the medicine, the record demonstrated that she
continued to be noncompliant even when able to afford it.
Accordingly, any error was harmless.  See Stout v. Comm'r, Soc.
Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error is
harmless when irrelevant to ultimate disability determination).

    Nor did the ALJ err in failing to address Plaintiff's single
complaint in seven years that Dilantin made her feel "high."  (J.
Stip. at 4; see AR 214.)  "[I]n interpreting the evidence and
developing the record, the ALJ does not need to discuss every
piece of evidence."  Howard ex rel. Wolff v. Barnhart, 341 F.3d
1006, 1012 (9th Cir. 2003) (internal quotation marks omitted).
The record contains no evidence that Plaintiff sought to address
the side effects of phenytoin with her prescribing physician.
Cf. Thomas, 278 F.3d at 960 (holding that ALJ properly discounted
alleged side effects caused by medication when claimant offered
no objective evidence of side effects but only her own
statements, which ALJ found not entirely credible); see also
Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)
(upholding ALJ's finding that claimant generally lacked
credibility as permissible basis for rejecting claimant's
testimony).  Indeed, Plaintiff's failure to adhere to the
prescribed dosage of phenytoin may have prevented her from
overcoming its side effects.  See Phenytoin, Epilepsy Found.,
http://www.epilepsy.com/medications/phenytoin (last visited Jan.
16, 2015) (noting that most phenytoin takers have little trouble
with side effects and common side effects tend to diminish within
several days).  Nor did any of her doctors opine that any feeling
of being "high" would interfere with Plaintiff's ability to

function.

For similar reasons, the ALJ did not err in failing to credit her statement that she would likely miss two or three days of work a month because of her seizure disorder. (J. Stip. at 4; see AR 49.) That claim was not substantiated by medical evidence or by the finding of any doctor. According to the record, even when noncompliant, Plaintiff sought treatment for alleged seizures only 10 times in nearly seven years. (See AR 164, 173, 183–85, 186–88, 190, 285, 325–26, 369, 431, 444; see also AR 214 (Plaintiff reporting in Apr. 2008 that last seizure was six months earlier).) Nor has Plaintiff submitted an electroencephalogram (EEG)[10] or other testing reflecting frequent seizures. (See AR 202 (in Nov. 2009, normal CT scan of brain), 399 (in Dec. 2011, normal MRI of brain).) And doctors who treated or examined her did not opine that her disorder would so limit her work attendance. (See AR 244 (examining doctor Prakash Desai stating that Plaintiff's sole limitation was to "avoid working in an environment where she would endanger herself or others if she was to have a seizure"), 156 (treating doctor Jimmy

---

[10]     An EEG is a test to measure the electrical activity of the brain.    See EEG, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003931.htm (last updated Feb. 10, 2014). If an epileptic seizure occurs during an EEG, the test will reflect abnormal brain activity.    See Checking Brain Waves, Epilepsy Found., http://www.epilepsy.com/learn/diagnosis/eeg (last updated Aug. 2013); Ambulatory EEG, Epilepsy Found., http://www.epilepsy.com/learn/diagnosis/eeg/ambulatory-eeg (last updated Aug. 2013).    Thus, an ambulatory EEG could be used to confirm that a patient was suffering from seizures as frequently as every other day.    See Ambulatory EEG, NYU Comprehensive Epilepsy Ctr., http://epilepsy.med.nyu.edu/diagnosis-treatment/eeg/ambulatory-eeg#sthash.PHpbtotv.dpbs (last visited Jan. 14, 2015).

Soliman noting that his office had treated Plaintiff for approximately nine months and that she "states she requires chaperone at all times due to the frequency of seizures"), 248 (on Feb. 16, 2011, treating doctor Rosabel Young noting only Plaintiff's difficulty in finding employment after disclosing condition).)  Rather, their statements and treatment of Plaintiff show that they believed that her seizures could be controlled with medication.  <u>Warre</u>, 439 F.3d at 1006.

On appellate review, this Court is limited to determining whether the ALJ properly identified reasons for discrediting Plaintiff's credibility.  <u>Smolen</u>, 80 F.3d at 1284.  Plaintiff's long-term noncompliance with prescribed seizure medicine was demonstrated by her own statements to her doctors, every drug-level test in the record, and the opinions of treating and examining physicians and thus was a sufficiently specific basis for discounting her allegations of a disabling seizure disorder, and the ALJ's reasoning was therefore clear and convincing.  <u>See</u> <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039-40 (9th Cir. 2008); <u>Houghton v. Comm'r Soc. Sec. Admin.</u>, 493 F. App'x 843, 845 (9th Cir. 2012).  Because the ALJ's findings were supported by substantial evidence, this Court may not engage in second-guessing.  <u>See</u> <u>Thomas</u>, 278 F.3d at 959.

Accordingly, remand is not warranted.

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.   IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: January 23, 2015

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[11]     This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

22